CARLOS ROSARIO MERCADO ET AL., Plaintiffs and Appellants, v. SAN JUAN RACING ASSOCIATION, INC., Defendant and Appellee.

No. R-65-228.        Decided June 6, 1967.

---

606

*S. L. Lagarde Garcés* and *Manuel Abréu Castillo* for appellants. *Brown, Newsom & Córdova,* and *Carlos Cebollero* for appellee.

Second Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, Mr. Justice Santana Becerra, and Mr. Justice Dávila.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

On March 17, 1965 the racing agents of Puerto Rico, who from April 4, 1962 to February 9, 1965 worked for the San Juan Racing Association, Inc., owner and operator of *El Comandante* racetrack, relying on the Uniform Declaratory Judgment Law, Act No. 47 of 1931, filed an action for a declaratory judgment against said association in order that the court, pursuant to § 6 subdivision 13 of the Puerto Rico Racing Act, approved July 22, 1960, and the Order of March 28, 1962 entered by the Racing Board, declare that defendant association owed them 10% on the total value of the daily double bets or wagers made in their respective racing agencies during said period.

San Juan Racing Association, Inc., appeared, alleging that the racing agents had raised a question before the Racing Board identical to the one raised in the action and that the same had been decided adversely to them by said Board by order of February 9, 1965, and that, although they accepted that the problem was not before the Racing Board, the fact that it had been settled by the latter deprived the court of jurisdiction on the matter for which reason the dismissal of the action for a declaratory judgment was proper. We insert the text of that allegation farther on.

The action was decided on the merits by judgment rendered on October 14, 1965 dismissing the complaint. The basic ground for that decision was that the Order of March 28, 1962 "does not have the scope sought to be given by plaintiffs and that it was thus correctly decided by the administrative entity with jurisdiction over the matter," in other words, that it did not fix any percent whatsoever to be paid to the racing agents on the value of the daily double bets made in their agencies.

We issued writ to review said final judgment. The appellant racing agents assign that the trial court committed the following errors:

"*First Error*—The court committed error of fact and of law in declaring that the Order of March 28, 1962 only provided for the payment of 10% commission to the racing agents in relation to the multiple combination and single combination pool bets (*cuadros y papeletas*) stamped and sold in their agencies.

*Second Error*—The court committed error of fact and of law in deciding that Art. 604 of § VI of the Act and Horse Racing Regulations only authorizes the Racing Board to fix the commission which shall be received by the agents in cases of *cuadros* and *papeletas* but not of daily double bets.*

*Third Error*—The court committed error of fact and of law in determining that the amendment of § 722 of the Horse Racing Regulations was made for the purpose of fixing the commission in favor of the racing agents in relation to the daily double bets when said amendment only refers to the manner of computing the commission of the agents previously fixed by the Order of the Racing Board of March 28, 1962 in relation to § 604 of the Horse Racing Regulations.

*Fourth Error*—The court committed error of fact and of law in ignoring the clear, precise, and unambiguous text of § 604 which authorized the Board to fix the commission which shall be received by the racing agents for the bets made through

---

* Editor's Note: The reference should be to Art. 604 of the Racing Regulations and to § 6 of the Racing Act.

them, and said commission shall be a share of the total value of the combinations played in the agencies.

*Fifth Error*—The court committed error of fact and of law in ignoring the definitions of 'multiple combination pool ticket', 'simple combination pool ticket', and 'daily double' of the Puerto Rico Horse Racing Regulations in §§ 114, 120, and 137.

*Additional Error*—The trial court committed error of fact and of law in dismissing the complaint, since it deprived the racing agents of just compensation for work performed for the San Juan Racing Association, Inc.; it permitted and sanctioned the unjust enrichment of the San Juan Racing Association, Inc., and ignored the constitutional right of every human being to receive equal pay for equal work (Art. 2, § 16 of the Bill of Rights of the Constitution of the Commonwealth of Puerto Rico)."

Plaintiffs-appellants are correct. All the errors assigned were obviously committed. The judgment will be reversed and another will be rendered instead declaring that the racing agents are entitled to the liquidation and payment, by the defendant-appellee association, of a commission of ten percent on the total value of the daily double bets made in their respective racing agencies from April 4, 1962 to February 9, 1965, with the additional pronouncements which we deem necessary for the effectiveness and execution of our judgment.

We shall state below the grounds for our decision. First, we shall summarize and comment on the antecedents of law which create the commission and fix the percentage on the daily double bets.

I

(A) *Provisions of the Racing Act.* The racing sport is regulated in Puerto Rico by Act No. 149 approved July 22, 1960 known as "Puerto Rico Racing Act." It was made retroactive to July 1, 1960. Its administration was granted by

said statute to a Racing Board and a Racing Administrator.

The Board was granted general and specific powers. Among the first, that of adopting, after a public hearing, rules and regulations for the racing sport, and rules for its organization and internal functioning and for the holding of meetings. The regulations adopted, after approval by the Governor and filing in the Department of State shall have "the force of law, and any violation thereof shall constitute a misdemeanor" punishable as provided therein.

Among the specific powers granted to the Racing Board in § 6 of the Racing Act in relation to the bets and the racing agents are the following:

"(2) To regulate all matters relating to the manner in which bets shall be placed in the [1] pari-mutuels (*bancas*), [2] pools and [3] daily doubles."

.    .    .    .    .    .    .    .

"(13) To fix the commission which the agents may receive *for the authorized betting systems*, said commission to be in every case the fixed per cent of the *aggregate value of the combinations or bets* of the respective agencies." (Italics ours.)

Section 12 of the law authorizes the following deductions in bets:

"The natural or artificial persons operating race tracks shall make the following deductions from the bets: twenty-five (25) per cent of the total sum wagered at the *bancas,* after deducting the money bet on the winning horses in the respective races, and thirty (30) per cent of the gross total wagers laid on the daily double combinations (*quiniela*), and the pool.

The gross total derived by reason of said deductions, except that from the *bancas,* shall be distributed in the following manner: ninety-five (95) per cent for the natural or artificial person operating the race track and five (5) per cent for the General Fund of the Commonwealth Treasury. The deduction from the *bancas* shall go to the race track."

(B) *Provisions of the Regulations:* The Racing Board adopted general regulations, which were approved by the Governor on February 23, 1962 and filed in the Department of State on the following April 2.

Section 1 thereof gives the meaning which the following words, among others, shall have:

(3) *Horse racing agent:* A person designated by the Association to receive *pool and daily double bets.*

(7) *Association:* A natural or artificial person authorized to operate a race track in Puerto Rico.

(8) *Mutuel:* Place designated for betting on each individual race and the betting system known by that name.

(14) *Multiple combination pool ticket:* Printed form on which two or more combinations of play in the pool are noted.

(20) *Daily double: A bet* to determine the winner *of two races* specifically designated for such *a bet.*

(37) *Single combination pool ticket:* Printed form where a single combination of play in the *pool* is noted.

(39) *Pool:* A wager consisting in determining the greatest number of winning horses and the greatest number of winning horses minus one.

Section 205 provides: "The rules, regulations and orders periodically issued by the Board shall insofar as pertinent form an integral part of the license originally issued." Section 223, with a slight alteration, repeats said § 205.

Section 601 authorizes the system of wagers, that is, the system of bets referred to in § 6 subdivision 13 of the Racing Act, as follows:

"The Association shall be under the obligation to maintain at its race track *a system of wagers for* [1] playing the *pool,* [2] *mutuel* and [3] *daily double* and shall not suspend said systems of wagers without the prior authorization of the Board;

Provided that to give said authorization it shall be the duty of the Board to hold a public hearing." (Italics ours.)

Section 602, in relation to racing agents to receive bets provides:

"The Association shall designate horse racing agents *to receive* [1] *pool* and [2] *daily double bets*." (Italics ours.)

Section 604 reproduced the above copied subdivision 13 of § 6 of the Racing Act, *but in the following terms:*

"The Board shall fix the commission to be received by the agents *for the bets made through them,* and said commission shall be *a share of the total value of the combinations played in the agency*." (Italics ours.)

■ There are several differences of expression between the text of said § 604 of the Regulations and that of subdivision 13 of § 6 of the Racing Act, which should be noticed, to wit:

1st. Said subdivision 13 speaks of the commission which the agents "may receive"; § 604 says "to be received."

2nd. Subdivision 13 says that the commission may be received "for the authorized betting systems"; § 604 says "for the bets made through them."

3rd. Subdivision 13 says "said commission to be in every case the fixed per cent"; § 604 reads "said commission shall be a share of the . . . value."

4th. Subdivision 13 says "of the aggregate value *of (1) the combinations or (2) bets*"; § 604 reads "of the total value of the *combinations played*." (Italics ours.)

Yet, after an analysis of such differences, the conclusion is reached that they are apparent, since the text of § 604 is merely a different manner of stating the same idea or concept that is stated in subdivision 13 of § 6 of the Racing Act.

For that reason the expression "combinations played" in the Regulations, in which the conjunction "or" is omitted,

and which is used in the text of subdivision 13 of § 6 of the Racing Act, should be read, understood, and applied as if it said "combinations or bets."

Section 683 says:

**"Mutuel, daily double and pool; separate calculations**

In every race the mutuel wagers to win and to place, the daily double wagers and pool wagers, shall be handled separately and the calculations on the same shall be made independently from each other."

Sections 701, 702, 704, 705, 706 and 707 of the Regulations provide:

**"Section 701. Place of wagers**

Daily double wagers can only be placed at the agencies and at the place designated for that purpose at the race track.

**Section 702. Only one daily**

Only one daily double shall be held per racing day. The Association shall designate which two races constitute the daily double.

.    .    .    .    .    .    .    .

**Section 704. System of wagering**

The daily double system of wagering will operate in the same manner as the single combination pool wagers, that is, that *only one combination can be made* on a single ticket on which the horses selected by the bettor will be designated by the number they have on the official program." (Italics ours.)

**"Section 705. Tickets**

Only tickets approved by the Administrator may be used for wagering on the daily double.

**Section 706. Value of combinations**

The value of *each combination on the daily double wager* shall be $2." (Italics ours.)

**"Section 707. Maximum price for bettors**

The price to the bettor *for each* daily double *form* shall not exceed 10 cents when obtained from a race track agent." (Italics ours.)

Sections 722 to 725 refer to the manner of making the computation of the *dividend* of the daily double, of announcing the dividend to the public, of its expiration, and the presumption of ownership of the daily double ticket.

Section 1401 prescribes for the violation of § 604, which deals with the commission of racing agents, a penalty of a fine of $500, suspension or cancellation of the license.

■■ The Horse Racing Regulations having been adopted and approved for the purpose of implementing the execution of the Racing Act, in the event of any conflict in their texts, that of the law should prevail. The text of the law should never be understood as modified or substituted by the Regulations. *Ex Parte Irizarry*, 66 P.R.R. 634, 638 (1946) and cases cited therein.

(C) *Order of the Racing Board.* On March 28, 1962 the Racing Board entered the following order which fixed the commission which the racing agents were to receive:

"ORDER

Pursuant to the provisions of § 6 subdivision 13 of the Puerto Rico Racing Act, and according to the provisions of § 604 of the Horse Racing Regulations adopted by this Board and approved by the Governor on February 23 of the present year, a commission of ten per cent (10%) is hereby fixed for the racing agents on the total value of the combinations played in the respective agencies.

This order will be effective from April 4 of the present year, until otherwise provided by this Board.

It was so agreed by the Board and ordered by its Chairman."

II

■ Relying on these antecedents, we affirm that the right of the racing agents to receive a commission for all the authorized betting systems (pursuant to §§ 601 and 704 of the Regulations (1) pool (2) mutuels, and (3) daily

doubles) of certain percent, or a share in the total value of the combinations or bets made in the respective agencies, was originally authorized, declared, defined and clearly established in § 6 subdivision 13 of the Racing Act, which went into effect, we repeat, on July 1, 1960.

The quantum, amount, or total of such percent or share was to be discretionally fixed by the Racing Board. For the exercise of this power two directive lines were previously fixed by the law to be followed by the Board, to wit:

(a) The commission, the amount of which shall be fixed, shall be for the authorized betting systems, that is, (1) pool, which includes single combination and multiple combination pool tickets and (2) daily doubles, which shall be made in the respective racing agencies, and

(b) *in any case* the percent or share shall be fixed on the *total value of the combinations or bets.*

The text of the Order of March 28, 1962 copied above exactly corresponds to the obligation imposed on said entity by the Racing Act, since it says:

"Pursuant to the provisions of § 6, subdivision 13 of the Puerto Rico Racing Act . . . a commission of ten per cent (10%) is hereby fixed for the racing agents on the total value of the combinations played in the respective agencies."

Although belatedly, the Racing Board, by positive and indubitable action, exercised its power of fixing the amount or total of such commission. It did not establish any distinctions, exclusions, or exceptions in relation to the types or classes of bets, wagers or combinations.

Neither the racing agents nor the San Juan Racing Association, Inc., challenged it in any manner whatsoever. Pursuant to §§ 205 and 223 such Order came to "form an integral part of the license originally issued" to the association. It became effective on April 4, 1962, two days after the Regulations went into effect. As yet, the Board has not provided "otherwise" in relation thereto.

Appellee accepts that the violation of § 604 could cause the cancellation of its license. Section 1201 of the Regulations provides, in part:

". . . Every person who in any capacity shall have obtained or obtains a license, or participates in any manner in horse racing, *shall be presumed to have done so with a full understanding and knowledge of the Horse Racing Act, . . . resolutions* and orders proclaimed or that may be proclaimed *and is under the obligation to comply with the same."* (Italics ours.)

■ Hence, starting April 4, 1962 a firm state of law was created in relation to the commission on the value of the multiple combination and single combination pool bets and daily double bets received in the agency, to be observed, respected and obeyed *erga omnes,* and above all, by the association.

■ Neither the lawmaker nor the Racing Board have provided or decided "otherwise". They have not altered, modified, repealed, annulled, or suspended, as a whole or in part, the Order of March 28, 1962. And the principle, which has its origin in § 5 of our Civil Code, that the laws shall only be repealed by means of subsequent laws, and disuse, custom, or practice to the contrary shall not impede their enforcement, is applicable, by analogy, to all lawful orders and resolutions of the Board and its Rules and Regulations. *Cf. Piñero, Governor* v. *Barreto,* 68 P.R.R. 136 (1948); *Reyes* v. *Torres,* 65 P.R.R. 772 (1946).

The San Juan Racing Association, Inc., respected, obeyed and complied with the Order of March 28, 1962. But only partially. It paid to its racing agents the commission of 10% only for the value of the *pool* bets, that is, only as to the *cuadros* and *papeletas* received in their respective agencies. But, notwithstanding having stated in writing "that it considered just and reasonable that the racing agents receive a ten per cent (10%) commission on the total amount

of the daily double bets" (Addendum 4) from April 4, 1962 to February 9, 1965, it refused to pay such commission on the daily double wagers, bets, or combinations. By itself, unilaterally, and capriciously, in practice it eliminated them from the Racing Act, from the Regulations, and the Order.

The reasons it adduces therefor as stated in its Memorandum dated January 26, 1965 (Appendix III, Objection to the Petition for Writ):

(A) The Order of the Board of March 28, 1962 is only applicable to "pool" bets and not to "daily double" bets, and that was the intention of the Board.

(B) Until August 10, 1964 the Regulations did not authorize the discount of the commission which corresponded to the agents in the daily double bets, and in the absence of such authorization, which was granted by amendment of said date to § 722 of the Regulations, such commission could not be paid.

(C) In order that the racing agents "may receive a commission on the daily double bets" it is necessary that the Board fix said commission by a new order.

None of those so-called reasons has the least trace, the slightest indication of juridical value or merit whatsoever. They are evidently untenable. Let us see.

(A) In support of the first reason the Association states in its brief that the intention of the Board in entering the Order of March 28, 1962 was "simply to renew the right of the agents to receive a commission on the pool bets which was to remain without a basis when the previous regulations ceased to govern" and, that "it is an eloquent indication also of the intention of the Board in adopting the order, that, subsequently, neither the Board nor the Racing Administrator took any action whatsoever to see that the agents receive a commission on the daily double bets, as would have been the case if the original order would have had that purpose."

■ The mere and alleged purpose which the new Board might have to renew the previous commission which the racing agents received for the pool bets, *cuadros* and *papeletas*, did not preclude the lawmaker from extending and amplifying such commission, as the Racing Act reads, to all the *authorized betting systems*, in every case, and *of the aggregate value of the combinations or bets* of the respective agencies; nor was the Racing Board bound not to make such extension, since, on the contrary, it effectively and clearly provided that the racing agents would receive such commission "for the bets made through them, and said commission shall be a share of the total value of the combinations played in the agency." Neither did the alluded purpose of exclusion or limitation prevent the daily double bets from being identified in the Regulations as one of the systems of wager— § 601—as a wager to determine the winners of two races specifically designated for such a bet—§ 1(20)—; nor did it preclude the Board, in including the daily double in the betting system, from obviously identifying it as a ticket in which *"only one combination* can be made"—§ 704—nor did it preclude its Regulations from providing that *the value of each combination on the daily double wager* be $2; nor did it prevent the Board from calling it "daily double wager", —§ 708—nor that the Racing Act itself—§ 12—speak about the gross total wagers played on the *daily double combinations* and the *pool*. After reading the Act and the Regulations, it must be necessarily understood that the daily double is a wager, it is a bet, it is a combination.

The fact that neither the Board nor the Administrator officiously took any action in order to procure the payment of the commission to the agents means nothing contrary to the true literal meaning of the Order, nor does it deprive the latter of effectiveness, validity, and obligatoriness. Such official silence is not equivalent to any repeal of the Regula-

tions or the orders and resolutions of the Board. There is no evidence that any person whatsoever requested their intervention or mediation in the matter. Even more, not even the racing agents themselves presented any claim whatsoever until the beginning of the year 1965. Likewise, such inactivity must not be given too much significance. Defenses of prescription or extinguishment have not been raised here.

Appellee also states in its brief that the combinations alluded to in § 604 of the Regulations "must be understood as being those of *'pool,'* and when the Board copied the phrase 'total value of the combinations played' it is reasonable to suppose that it intended to use it in the same limited sense, although the words used, considered by themselves, *were susceptible of a wider definition."*

Of course, defendant association does not resort to the ample language, to the all embracing and comprehensive sense of the text which here is more binding, not only to it, but to all: that of subdivision 13 of § 6 of the Racing Act.

■ Said subdivision 13 creates a commission *"for the authorized betting systems"*—pool, *cuadros, papeletas,* mutuels, daily doubles constitute, by Regulation, such systems, §§ 601 and 704, we repeat for the fourth or fifth time— "said commission to be in every case the fixed per cent of the *aggregate value of the combinations or bets* of the respective agencies." A bet is the *cuadro,* it is the *papeleta* (the wager at the mutuel, but which is not made in the agencies) and it is the daily double wager. Appellee itself calls the daily double "daily double bet" on several occasions.

The trial court itself, upon referring to the ample scope of § 6 subdivision 13 of the Racing Act, tells us that it is *"a section of the law which undoubtedly embraces all* the racing wagers . . . ."

The San Juan Racing Association, Inc., exploits the error in language committed at the end of § 604 of the

Regulations in omitting, supposedly inadvertently, the conjunction "or" of the phrase "combinations or bets" used in § 6 subdivision 13 of the Racing Act, and using instead, in said Regulations, only the words "combinations played".

■ But even so, the term "combinations played" logically comprises and refers to the daily double bet. "To combine" means to unite different things to form a compound or aggregate, and "combination" is the union of two things in the same matter, according to the *Diccionario de la Lengua Española.*

Let us return to the definitions contained in the Horse Racing Regulations, § 1. There we find that the daily double (*quiniela*) is "A bet to determine the winner *of two races specifically designated for such a bet.*" That is, of the number of horses participating in the fifth race, in which up to fourteen horses may compete, the daily double bettor chooses one, and of those running in the sixth race he chooses the other. Both horses, thus combined, form the daily double. So that, obviously, the daily double is included in the term "combinations played" of § 604 of the Regulations. And if this were not sufficient to understand it that way, we again copy §§ 704 and 706, to prove it definitively.

"§ 704. System of wagering

The daily double system of wagering will operate in the same manner as the single combination pool wagers, that is, that *only one combination* can be made on a single ticket on which the horses selected by the bettor will be designated by the number they have on the official program." (Italics ours.)

"§ 706. Value of combinations

The value of *each combination* on the daily double wager shall be $2." (Italics ours.)

In the light of these two sections of the Regulations the affirmation made by appellee in its brief as well as by the trial court in its decision, in the sense that the

Regulations "use the word 'combinations' . . . in connection with the multiple combination pool bets . . . *but not in connection with daily double bets*" is incorrect. (Italics ours.)

(B) Section 722 of the Regulations provides:

"722.—**Computation of Dividend.** The pay-off on the daily double shall be .computed and paid as follows:—From the gross total wagered the deduction of 30% fixed by law shall be made; the excise taxes of 10% imposed by law shall be deducted from the balance; the remaining balance ,shall be divided among the winning tickets to determine the pay-off for each ticket."

This section has nothing to do with the granting of the right to receive the commission on the value of the daily double wager or bet made in § 6 subdivision 13 of the Racing Act; nor with the percent or share fixed by the Order of March 28, 1962. Neither the right to receive it, nor the proportion to be received is affected by § 722 which only establishes the mechanics or process for the liquidation or computation of the daily double dividend, as does § 640 in relation to the pool and §§ 687 and 688 in relation to mutuel bets. Section 683 requires that the mutuel wagers, daily double wagers and pool wagers "shall be handled separately and the calculations on the same shall be made independently from each other."

The simple mathematical computation, if it may be so called, of the commission of the agents for daily double bets, need not be submitted to any process of computation of the dividend. It is prefixed. The value "of each combination on the daily double wager shall be $2.00," § 706 provides. Ten percent of that value is 20 cents.

Each agent delivers the amount of $2.00 to the racing track for each daily double bet sold in his agency. As soon as the value of each daily double bet is delivered, it becomes, at law, a perfect title of a share of said value of 20 cents. Now those twenty cents per daily double bet do not belong

to the State, nor to the San Juan Racing Association, Inc., nor to the Racing Administration, nor to the daily double bet winners. They belong from that instant to the respective racing agents, by operation of the law, and it should be delivered to them at the proper time.

How, then, is it possible to maintain, as it was maintained before the Board, that it was when § 722 was amended on August 10, 1964 that "for the first time the deduction of the commission for the agents on the daily double wagers was authorized"? How can it be seriously affirmed that it was not until the date of such amendment "that the way was free for the Board to fix the commission for the agents in the daily double bet. *Which has not been done yet*"?

Of course, it is possible to maintain such position only in the light of the incorrect interpretation made by the San Juan Racing Association, Inc., that the Order of March 28, 1962 "only refers to pool bets" and not to daily double wagers. With such an incorrect theory they succeeded in persuading the trial court.

At law, the way was free since July 1, 1960, over four years before, but rather since said Racing Board was constituted, in the light of a legal provision absolutely clear and free of all ambiguity.

The Racing Act, in granting the Racing Board power to fix the quantum of the commission for the agents in relation to the combinations or racing bets made in the agencies, did not condition, subject to, or supersede its exercise to the previous adoption of a mechanism or process for the computation of the dividend of daily double bets or wagers, nor even to the adoption and effectiveness of any Regulations. Believing it to be so, the Board fixed the percent by order approved prior to the date on which the Regulations became effective, although it made it effective subsequent to such date.

(C) To receive the commission for daily double bets the approval of a new order was not absolutely necessary. That of March 28, 1962 was sufficient and enough at law for that purpose. Of course, the San Juan Racing Association, Inc., did not believe it to be so in relation to the daily double bets.

However, after two years eight months had elapsed from the date—April 4, 1962—on which it should have started to pay the commission for daily double wagers, without having paid it, not because payment was not demanded, but because it did not feel bound to do so, appellee San Juan Racing Association, Inc., on December 16, 1964, filed a petition before the Racing Board which says:

"1. That the racing agents are not receiving any commission on the amount or value of the daily double bets which are being made in the racing agencies.

2. That petitioner considers just and reasonable that the racing agents receive a commission of ten per cent (10%) on the amount of the daily double bets, that is, an equal per cent to that which the racing agents receive and have been receiving since some time ago on the amount of the pool bets made in their agencies.

3. That on March 28, 1962 that Racing Board entered an order in conformance with the power granted to it by § 6 subdivision 13 of the Puerto Rico Racing Act, fixing 'a commission of ten per cent (10%) for the racing agents on the total value of the combinations played in the racing agencies.'

4. That in practice this order has been interpreted and applied in the sense that it refers only to pool bets.

FOR ALL THESE REASONS petitioner requests this Board, pursuant to the provisions of § 6 subdivision 13, of the Puerto Rico Racing Act and § 604 of the Horse Racing Regulations in force, to enter an order fixing a commission of ten per cent (10%) for the racing agents on the aggregate value of the daily double bets in the respective agencies after the pertinent proceeding."

In such petition it implicitly confesses that the commission for daily double bets has not been paid to its agents; it considers "just and reasonable" that they receive a ten percent commission; it refers to the order of 1962, but it alleges "that in practice, this order has been interpreted and applied—without specifying by whom—in the sense that it refers only to pool bets." Finally it requests that the Board do, repeat, or duplicate what it had already legally done: fix the percent "of the aggregate value of the combinations or bets of the respective agencies," as the law ordered. But it takes care to avoid doing due justice to those who throughout all the cities, towns and wards of Puerto Rico strive to receive racing bets from the betting public, who day after day of racing, in times of abundance as well as in times of dearth give their support to the costly sport of horse racing. It does not request the Board, since it would do the same as it had done on March 28, 1962, to make the order sustaining its petition retroactive to such date and to provide in conformance thereto.

The Racing Board should have flatly dismissed said petition. The reasons are obvious: (1) the same was a collateral and belated attack against the Order of March 28, 1962, the unquestionable effectiveness of which, in relation to the daily double wagers was sought to be annulled; (2) because it was confiscatory because of the absence of the petition for retroactive effect; (3) because it tended to protect an unjust enrichment;[1] (4) because it tried to ignore or destroy vested rights under a consented juridical status predicated on a law, Regulations, and a previous order; (5) because it tried to annul the effectiveness of a Regulation and a previous order on

---

[1] Appellants inform that from July 1962 to February 1965, 2,326,121 daily double bets were played in the racing agencies, with a total value of $4,652,242, of which $465,224.20 should be paid to them for the 10% commission.

the basis of its own practice and interpretation of provisions and orders which are clear and free from ambiguity.

Instead of so doing, on February 9, 1965, the Racing Board entered an ineffectual order, which did not create any state of law different from the one in force, which did not respond to any real or positive necessity, but which for the spurious glory and unlawful benefit of the San Juan Racing Association, Inc., and in accord with the interpretation of the latter, without deciding it, might create the sensation that (1) until February 9, 1965 the racing agents were not entitled to any commission whatsoever on the daily double bets; (2) the lavish generosity of the San Juan Racing Association, Inc., granted them said right; (3) the San Juan Racing Association, Inc., determined and fixed the quantum of such commission, the Board limited itself to obediently adopt it.

The Superior Court, San Juan Part, which declares frankly, expressly, and openly, that subdivision 13 of § 6 of the Racing Act, which is the text of greatest juridical authority in the matter, is "*a section of the law which undoubtedly embraces all the racing wagers,*" should have never decided that the new, ineffectual and superfluous order of February 9, 1965, "has the effect of settling the question raised by the racing agents rejecting the argument of the latter in the sense that the previous order—that of March 28, 1962—had entitled them to receive a commission on the daily double wagers." In the presence of such affirmation, we can say that, in relation to the respondent trial judge, said ineffectual and superfluous order created, not only a mere sensation, but an inexplicable conviction, since the order of 1965 did not settle any controversy.

### III

Under the title of "The Procedural Question" appellee raises the illegality of the declaratory action. We are going

to set forth, as we understand it, which was the procedural reality previous to the initiation of the action.

As we already stated, on December 16, 1964, the San Juan Racing Association, Inc., filed a petition before the Racing Board requesting that a commission be fixed for the agents on the daily double bets. It was predicated on the absence of such commission. It would be paid, of course, starting on the date on which it was fixed. The petition was not notified to any person whatsoever.

On January 22, 1965 the racing agents filed before the Racing Board a petition entitled "Memorandum" in which they copied subdivision 13 of § 6 of the "Racing Act" and the Order of March 28, 1962. They stated therein that the commission granted by law and fixed by said order had not been paid to them and prayed that the Board order the "payment of the amounts indebted to the Racing Agents of Puerto Rico of 10% of the daily double bets from and after March 28, 1962." This "Memorandum" does not contain any answer to the previous petition to the association, it does not even mention it.

In the record the Association presented a "Memorandum" which only tends to support its own petition. It does not contain any reply to the agents' petition.

On February 9, 1965 the Board, disposing of the petition of the San Juan Racing Association, Inc., entered the following order:

"ORDER

In the exercise of the power granted to us by § 6 subdivision 13 of the Puerto Rico Racing Act, and pursuant to § 722 of the Horse Racing Regulations, as amended, a commission of ten per cent (10%) is hereby fixed for the agents on the aggregate value of the combinations played in the daily double bets made in the racing agencies.

It was thus agreed by the Board and ordered by its chairman."

The effectiveness and application of such order is prospective. It projects toward the future. Not toward the past, because no retroactive effects are expressly conferred. It supposedly grants, for the first time (although it says that it is adopted "In the exercise of the power granted to us by § 6, subdivision 13 of the Racing Act") a commission of 10% to the agents on the value of the daily double bets, just as the San Juan Racing Association, Inc., requested it. Nothing is decided, in favor or against, in relation to the petition of the racing agents in their "Memorandum" of January 22, 1965, claiming the payment of what they alleged was indebted to them since March of 1962. So that the claim of the racing agents before the Board was still pending.

The declaratory action before the Superior Court, as we stated, commenced on March 9, 1965. The defendant association filed, on the following April 5, a "Motion for Lack of Jurisdiction on the Matter" which reads:

"To the Court:

Now comes defendant and through its undersigned attorney, states:

1. That the complaint filed by a number of racing agents on behalf of them all, requests, 'that the payment of the amounts indebted to the Racing Agents of Puerto Rico of 10% on the daily double bets be ordered as of March 28, 1962.'

2. That paragraph IX of the complaint asserts that 'there is no other matter pending for decision before any other court, Board, or administrative officer as to questions of law which may be involved in this proceeding.'

3. That although we do not disagree with plaintiffs in the sense that the problem raised in their complaint is not before the Racing Board, if it is not, it is because when it was raised before said Board it was decided adversely to the plaintiffs, the latter having timely raised the problem before the Racing Board on January 22, 1965, in the case of San Juan Racing Association, Inc., Petitioner, Case No. J.H.-64-30, on 'The Fixing of the Commission for the Agents in the Daily Double

Wagers,' and the Board having decided the case by order of February 9, 1965. Faithful copies of the order and of the allegations before the Board are attached, to wit, the petition of the San Juan Racing Association, Inc. to fix a commission of 10% for the racing agents on the aggregate value of the daily double bets and the petition of the racing agents of Puerto Rico requesting the Board (within the same proceeding filed by the San Juan Racing Association, Inc.) that since the payment of 10% on the daily double wagers had already been authorized by the Board on March 28, 1962, it was proper to order the payment of said 10% retroactive to March 28, 1962.

BY VIRTUE OF THE FOREGOING and having resorted to an administrative proceeding before a competent court in which the same problem was raised which is now sought to be raised judicially, we pray that the court declare itself without jurisdiction to entertain the case, or in default thereof to dismiss it."

About three days later, April 8, the agents appeared by brief before the Racing Board, informed it of the filing of the declaratory action, of the motion of the association copied above challenging the jurisdiction of the Superior Court, and that the new order of that Board of February 9 "exclusively limits itself to the request of the San Juan Racing Association, Inc. in its petition of December 16, 1964 and did not make any provision as to the retroactivity requested in the declaratory judgment before the Superior Court . . . ."

But they requested of the Racing Board something which was not necessary, pursuant to the provisions of § 2 of the Civil Code, that is, that the Board make "a pronouncement in the sense that the retroactivity was not decided by the order of February 9, 1965."

We say unnecessary, because to prove such point the text of the order itself is enough. But the Board, instead of so deciding, entered an order on April 12 stating ". . . this Board abstains itself from making pronouncement of any

kind whatsoever because it appears therefrom that this is a problem which is sub-judice. . . ."

The racing agents did not have grounds to request the reconsideration of the new order of the Board dated February 9, 1965, which granted, according thereto, the commission of 10% which existed for years, and which could not affect substantive rights acquired under the Act of 1960, of the Regulations of 1962, and of the order of March 28, 1962; nor to challenge it by the judicial proceeding provided in § 9 of the Racing Act, nor by any executive action, necessarily.

That was the actual or true procedural situation of said problems at the time the declaratory action was initiated and after it was initiated. There existed no impediment to cause an exception to the rule of § 1 of the Uniform Declaratory Judgment Law of 1931 in the sense that "The Superior Court shall have power to declare rights, status and other legal relations *whether or not further relief is or could be claimed.*" (Italics ours.)

The trial court implicitly dismissed the impeachment of its jurisdiction in deciding "to render judgment on the merits of the case." It considered that it had all the elements or factors of judgment to do it.

Now then. Since the San Juan Racing Association, Inc., did not formulate allegations on the facts, partly possibly due to the fact that the trial court proceeded to decide the case on the merits in its favor, and in view of the fact that in its brief it maintains "that it is not true that appellants did not receive any amount whatsoever for the services rendered by them to the public in selling daily double tickets, since we have seen that they received eight cents for each two dollar daily double ticket sold by them," and that it "received only 5.7 cents of the twenty cents claimed by appellants" and that "what is paid by error of law may not be recovered," we will decide that the original record

be remanded to the court of origin so that there the parties may raise the questions and resolve all matters concerning the final liquidation of the amount and payment to the racing agents of the 10% commission on the aggregate value of all the daily double wagers played in their respective agencies from April 4, 1962 to February 9, 1965.